STATE OF NEBRASKA, APPELLEE, V.
FREDERICK C. WHITE, JR., APPELLANT,
732 N.W.2d 677

Filed April 17, 2007.    No. A-06-794.

[redacted]

Peter K. Blakeslee for appellant.

Jon Bruning, Attorney General, Kimberly A. Klein, and Jonathan Brandt, Senior Certified Law Student, for appellee.

Inbody, Chief Judge, and Irwin and Sievers, Judges.

SIEVERS, Judge.

Frederick C. White, Jr., appeals from the decision of the district court for Lancaster County which, after a jury trial, found White guilty of one count of burglary and found that White was a habitual criminal. The district court sentenced White to 12 to 14 years' imprisonment, with 516 days' credit for time served. The primary issue is the legality of a police officer's stop of White's vehicle based largely on a citizen's report of what we shall call "suspicious activity."

## FACTUAL AND PROCEDURAL BACKGROUND

On July 27, 2005, the State filed an amended information charging White with burglary, a Class III felony, and being a habitual criminal.

On May 10, 2005, White filed a motion to suppress any and all evidence taken from him, his vehicle, his living quarters, or any other place in which White had an expectation of privacy. White alleged, summarized and restated, that (1) the items of evidence were taken without any valid or legal consent to search; (2) there was no probable cause for the search or seizure of any of said evidence; (3) the search for and seizure of the items of evidence violated White's rights under the applicable provisions of the U.S. Constitution as well as the Nebraska Constitution and statutes; (4) there was no probable cause for his arrest and that thus, the search and seizure was not incident to a lawful arrest; and (5) said search and seizure was not conducted pursuant to a lawfully issued warrant. A hearing on the motion to suppress was held on May 26.

At the suppression hearing, Lincoln police officer Steven Wiese testified that on January 18, 2005, he stopped a vehicle driven by White for speeding. The vehicle had two other occupants, later identified as Brian Sears and Joseph Mohlman. Wiese issued White warnings for speeding, no valid registration, and no insurance, and then Wiese sent White on his way. Wiese then saw a Jeep Cherokee occupied by two females parked behind his cruiser. Wiese testified that the women, later identified as Shonna Jordan and Paula Graybill, said that the occupants of White's vehicle were seen running from Jordan's apartment building "wearing masks" and that the men were not recognized as belonging at the

apartment building. The women in the Jeep reported they had followed the vehicle to the point of the traffic stop. Jordan and Wiese agreed in their testimony that this conversation lasted 30 seconds or less. During the suppression hearing, and later at trial, there were inconsistencies in the testimony of both Wiese and Jordan as to exactly what Wiese was told regarding what the men were wearing on their heads when seen by Jordan. The conflict comes down to whether Jordan had said that the men were wearing "hats," "hoods," or "masks." Based on what Wiese had been told, he immediately got back into his cruiser and stopped White's vehicle again. White had driven less than two blocks from the first stop and was stopped at a red light.

Wiese approached the driver's side of White's vehicle, asked the occupants to place their hands where he could see them, and then radioed for backup. Wiese testified that at that point, he was concerned that a crime had occurred or was going to occur. A Sergeant Scheinost and Officers David Domeier and Lisa Rose arrived within 2 to 5 minutes. Then Wiese had each occupant exit the vehicle individually so they could be separated. Sears, who was in the front passenger seat, was asked to exit the vehicle first. As Sears was exiting the vehicle, Wiese observed a glass or plastic test tube with white residue—what Wiese thought was a "meth pipe." While walking Sears back to the police cruiser, Wiese asked Sears where he had been that evening, and Sears said he was trying to find an apartment of an acquaintance. After a pat-down search, Sears was placed in Wiese's police cruiser. Wiese had White get out of the vehicle and placed him in Scheinost's police cruiser, and Wiese then had the third passenger, Mohlman, get out of the rear seat of the vehicle and turned him over to Rose. White and Mohlman were also patted down, but not by Wiese.

Wiese asked Domeier to go back to the apartment complex and look around. Wiese testified that at this point, Jordan told Domeier that she lived in a four-plex with a common stairwell and that while talking on her cellular telephone with Graybill, Jordan heard a door close, which she thought to be the door to the laundry room. She looked and saw three men running out of the apartment building from the laundry room. Jordan and Graybill met near Jordan's apartment within minutes; got into Jordan's Jeep; attempted to locate the three men, which they did within a

short amount of time; and then proceeded to follow the vehicle to the point of the traffic stop by Wiese. During the time the two women followed the vehicle, they saw it hit a parked car, causing minor damage, but White did not stop. This "hit-and-run accident" was not reported to Wiese before the second stop.

Wiese testified that he searched White's vehicle incident to the arrest of Sears for possession of the pipe, which was believed to be drug paraphernalia. On the front passenger seat where Sears had been seated, Wiese found a pile of clothes, including a sweatshirt, a stocking cap, and gloves. In the hat and gloves, Wiese found two baggies containing a white crystalline substance that he believed to be methamphetamine. A field pretest of such substance was positive for methamphetamine. On the floor of the rear driver's side where Mohlman had been seated, Wiese found a gray "NBC" bank bag, which contained deposit slips, U.S. currency, and checks made out to "Pockets of Enthusiasm."

As the search of the vehicle was proceeding, there was a message over the police radio that there had been a report of a burglary at Jordan's apartment complex, from which the three men were seen running. Officer Court Cleland then went to the apartment complex to investigate. The woman who reported the burglary, Melanie Wolfe, was brought from the apartment complex to the scene of the second stop of White's vehicle, and she identified the bank bag found therein as hers. Some police officers had searched Mohlman by that time and found some envelopes containing cash and some "needle-nose pliers" on his person. Rose testified that Wolfe identified the envelopes and pliers as hers. A search warrant was obtained for the search of the trunk of the vehicle, and several items that Wolfe had reported missing from her apartment were found in the trunk.

In an order filed July 20, 2005, the district court overruled White's motion to suppress. The district court held that "[t]he citizen's report of this suspicious activity does constitute reasonable cause for the investigative detention" and that "the court having considered the totality of the circumstances . . . there was probable cause for the [search] and [arrest] of [White]." White's motion to reconsider the motion to suppress was overruled. The trial judge found that Wiese had been told that the men were wearing masks.

After the first trial ended in a mistrial because of a "hung jury" at 11-1 for conviction, the jury in the second trial found White guilty of burglary. White filed a motion for a new trial, which was denied by the district court. After a hearing on June 22, 2006, the district court found that White was a habitual criminal and sentenced him to 12 to 14 years' imprisonment, with 516 days' credit for time served. White now appeals.

## ASSIGNMENTS OF ERROR

White alleges that (1) the district court erred in overruling his motion to suppress evidence; (2) the district court erred in rejecting his offer of proof and refusing to allow him to cross-examine State's witness Jordan about her pending felony charges; and (3) his second trial counsel provided ineffective assistance of counsel when counsel failed to provide details of Jordan's pending felony charges and to provide the available legal authority requested by the trial judge to support White's contention that he should be allowed to cross-examine Jordan about those charges, claiming that he therefore should be granted a new trial.

## STANDARD OF REVIEW

The standard of review applicable to each assignment of error will be set forth in the analysis of each assignment.

## ANALYSIS

*Suppression of Evidence.*

White argues that the trial court erred in overruling his motion for suppression of the evidence found in his vehicle, and we note that this objection was properly preserved at trial for appellate review. A trial court's ruling on a motion to suppress based on the Fourth Amendment, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Allen*, 269 Neb. 69, 690 N.W.2d 582 (2005). The ultimate determinations of reasonable suspicion to conduct an investigatory stop and probable cause to perform a warrantless search are reviewed de novo and findings of fact are reviewed for clear error, giving due weight to the inferences drawn from those facts by the trial judge. *Id.* When reviewing a trial court's ruling on a motion to

suppress evidence, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Brown*, 13 Neb. App. 359, 693 N.W.2d 559 (2005).

■ When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006).

White argues that the officers did not have reasonable suspicion based on articulable facts that he committed a crime, was committing a crime, or was about to commit a crime, and that thus, they had no justification for the second stop of his vehicle and the subsequent warrantless arrest and search.

■ Wiese readily concedes that after he made the second stop of White's vehicle, the occupants of White's vehicle were not "free to leave." But, there was clearly no probable cause to arrest them for the burglary of Wolfe's apartment or for drug offenses, because at that point there simply was no information available to Wiese that a burglary had even occurred or that drugs were in the vehicle. Thus, if the stop was lawful, it was lawful only as a *Terry* stop—a point which the State conceded during oral argument. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Accordingly, under *Terry*, our examination must focus on whether there was "objective justification·for detention," which involves more than an "unparticularized suspicion or 'hunch.'" *State v. Ellingson*, 13 Neb. App. 931, 942, 703 N.W.2d 273, 283 (2005). Therefore, we closely examine the information that Wiese had in hand at the time of the second stop, and in doing so, we bear in mind that our standard of review for reasonable suspicion for a *Terry* stop is de novo, but we review the trial court's factual findings for clear error. See *State v. Allen, supra.*

At the moment that Wiese made the second stop, he had the following pieces of information: First, he had previously stopped the vehicle for speeding. Second, he had been told in a rather frantic and urgent 30-second conversation with Jordan and Graybill that the occupants of the vehicle had been seen running from an apartment building where one of the women lived and that the

men were not recognized as belonging there. Third, the occupants of White's vehicle were wearing "something" on their heads. We say "something" because the record is contradictory and unclear, in the testimony of both Wiese and Jordan, whether Jordon told Wiese that they were wearing "hats," "hoods," or "masks." However, in this regard, we note that the trial court's ruling on the motion for suppression found that Wiese had been told they were "wearing masks." This is a factual determination to which we give deference under our standard of review, because the trial judge saw the witnesses testify. As noted earlier, the evidence from the suppression hearing and the trial is in considerable conflict regarding what Wiese was told about what the men were wearing on their heads. We will not repeat such testimony, because it is sufficient to say that on this disputed point, the trial court made a factual finding that Wiese was told that they were "wearing masks." While the evidence on this point admittedly is in conflict, after our review of the evidence, we are unable to conclude that the trial judge's factual finding was clearly erroneous. Thus, our analysis of the basis for the second stop proceeds with the factual finding that Wiese was told that the men running from the apartment building were "wearing masks."

Because Wiese was acting upon information gained from the women in the Jeep, this factual scenario clearly implicates the doctrine of a citizen informant. A citizen informant is a citizen who purports to have been the witness to a crime who is motivated by good citizenship and acts openly in aid of law enforcement. *State v. Marcus*, 265 Neb. 910, 660 N.W.2d 837 (2003). The legal effect is that an untested citizen informant who has personally observed the commission of a crime is presumptively reliable. *Id.* But, witnessing the actual commission of a crime is not the only indicia of the citizen's reliability. In *State v. Bridge*, 234 Neb. 781, 783, 452 N.W.2d 542, 545 (1990), the Supreme Court said:

> "An investigatory stop must be justified by an objective manifestation, based upon the totality of the circumstances, that the person stopped has been, is, or is about to be engaged in criminal activity." *State v. Ege*, 227 Neb. 824, 826, 420 N.W.2d 305, 308 (1988) (citing *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)).

The factual basis for the stop need not be the officer's personal observations alone, but may arise from information provided by another person. *Adams v. Williams*, 407 U.S. 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *State v. Ege, supra.* When the information providing the factual basis for the stop is furnished by another person, it must contain sufficient indicia of reliability. *State v. Ege, supra.* A detailed eyewitness report of a crime by an informant provides its own indicia of reliability because a citizen informant who has personally observed the commission of a crime is presumed to be reliable. *State v. Ege, supra.*

The two women in the Jeep who made the report to Wiese clearly had not personally observed the commission of a crime, because running from an apartment building, even when wearing masks, and being unrecognized by a resident of that building is not the commission of a crime. While the heart of the citizen informant doctrine is indicia of the citizen's reliability, the ultimate test of the legality of an investigatory stop is that it be "justified by an objective manifestation, based upon the totality of the circumstances, that the person stopped has been, is, or is about to be engaged in criminal activity." See *State v. Ege*, 227 Neb. 824, 826, 420 N.W.2d 305, 308 (1988).

*State v. Ege, supra*, is instructive because it involves a report of suspicious activity (although not so designated by the court) from a citizen who openly approached a police officer—just as the two women in the Jeep did in the instant case. In *Ege*, an officer of the Omaha Police Department was in her cruiser, parked next to a gas station, and attending to some paperwork when an employee of the gas station approached her, identified himself, and directed the officer's attention to a green car in a parking lot across the street. The employee told the officer that the driver of the car had just driven up over the curb near the front door of the station, that the driver entered the station to purchase some chewing gum, and that the driver smelled strongly of alcohol. The officer drove across the street to follow the vehicle. She observed the car start and stop three or four times in the parking lot, and although she followed the car for a short distance without observing any moving violations, she nonetheless stopped the car. The officer noted a strong odor of alcohol on the driver's breath and

also noticed slurred speech. The driver failed a field sobriety test, and an Intoxilyzer test later showed his blood-alcohol content was 0.149 percent.

The *Ege* court rejected the contention that the stop was illegal, reasoning as follows:

> Here, there was a face-to-face confrontation between the informant and the officer. The informant identified himself by name and, in doing so, positioned himself to be held accountable for his intervention. By giving his name, the informant presumably knew that the police could arrest him for giving a false report. See Neb. Rev. Stat. § 28-907 (Reissue 1985). The informant's knowledge was based upon his observation of the defendant's driving his car over a curb, as well as on his face-to-face encounter with the defendant. Clearly, the informant in this case was of the most reliable type.
>
> The description and reported location of the vehicle could not have been more accurate, since the informant was able to point directly to the car. Although [the police officer] did not observe any traffic violations, she did observe the defendant's vehicle move erratically in the parking lot. There was, apparently, little time between the informant's report and the subsequent stop of the defendant's vehicle. We conclude on these facts that the stop was legal.

227 Neb. at 827-28, 420 N.W.2d at 308.

The *Ege* case is obviously very similar to the instant case in its fundamental premises. In the instant case, the women admittedly did not provide their names to Wiese at the time of the report, but their vehicle was readily identifiable by the license plate, plus they followed Wiese's directions to "stay where they're at" and after the stop provided additional information and their identities. Their contact with Wiese was made immediately following the events Jordan had witnessed and was conveyed with a sense of urgency after they saw Wiese let White go. The accuracy of the women's report is supported by the facts that they identified the vehicle Wiese had stopped as the one they observed; that the vehicle contained three men, and Jordan had observed two men wearing masks hurrying away from the apartment building and entering the vehicle in which a third person was waiting in the front passenger seat; that while following the vehicle, Jordan

observed three men in it; and that Wiese shortly thereafter stopped the driver of the vehicle for speeding.

However, it cannot be said that Jordan witnessed the commission of a crime, just as the informant in *State v. Ege, supra*, only encountered a possible drunk driver. Driving over a curb while smelling of alcohol is not a crime—unless one has had too much to drink. Similarly, fleeing an apartment building is not a crime unless one has committed a crime there. Accordingly, while Jordan witnessed only suspicious activity, as did the informant in *Ege*, Jordan was a reliable informant by the nature and circumstances of her report. Thus, her report was entitled to be treated as reliable and credible by Wiese.

We now turn to the requirements for a *Terry* stop:

> Limited investigatory stops are permissible only upon a reasonable suspicion, supported by specific and articulable facts, that the person is, was, or is about to be engaged in criminal activity. . . . *Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause.* . . . Whether a police officer has a reasonable suspicion based on sufficient articulable facts requires taking into account the totality of the circumstances.

*State v. Ellingson*, 13 Neb. App. 931, 942, 703 N.W.2d 273, 283 (2005) (citations omitted) (emphasis supplied). See, also, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

■ Consequently, we look for specific and articulable facts the officer had in hand that are more than an unparticularized hunch of involvement in criminal activity. Wiese was entitled to treat Jordan's report as reliable, including that the vehicle's occupants had just run from her apartment building wearing masks and that she did not recognize them. Wiese had stopped the driver of the vehicle for speeding within a short distance of the apartment complex that the vehicle's occupants were seen running from. It is the totality of the circumstances which determines whether reasonable suspicion to conduct an investigatory stop exists, and acts, even if innocent when viewed separately, may warrant further investigation when viewed together. See *State v. Chronister*, 3 Neb. App. 281, 526 N.W.2d 98 (1995). Wiese had a reliable

report of events that had just been observed, which events could indicate that a crime had just been committed and that the vehicle's occupants were fleeing from their misdeed. Additionally, Wiese was aware of the proximity of the first stop to the apartment complex, the obviously suspicious nature of the behavior observed, the urgency of the women's report, and the speeding. Such awareness gave Wiese a reasonably objective suspicion that criminal activity was afoot, and he was entitled under the *Terry* doctrine to make a brief stop to confirm or dispel his suspicions. To do that, he removed passenger Sears from the vehicle once backup arrived in order to ask him about his whereabouts, and Sears' account that he was looking for a friend at an apartment complex did nothing to damage the citizen report—and may have enhanced it. After getting Sears out of the vehicle, Wiese immediately observed what he thought to be a "meth pipe" on the floorboard, which provided further suspicion that criminal activity was going on as well as grounds to search the vehicle for narcotics. That search turned up two baggies containing a white crystal-like substance which Wiese thought was methamphetamine and which field-tested positive for such. The search of the passenger compartment incident to Sears' arrest for possession of drugs turned up the NBC bank bag containing what turned out to be fruits of the burglary of Wolfe's apartment, which burglary was confirmed via police radio shortly after the discovery of the NBC bank bag. After giving deference to the trial judge's factual finding that it was reported the men were wearing masks, we make an independent determination as required under the applicable standard of review that the second stop was a lawful investigative *Terry* stop and that the evidence of the crime gained from such stop was not subject to suppression. This assignment of error is without merit.

### *Offer of Proof and Cross-Examination of Jordan.*

White argues that the trial court erred in rejecting his offer of proof and refusing to allow him to cross-examine State's witness Jordan about her pending felony charges.

On cross-examination, Jordan testified that in the last 10 years, she had been convicted of two felonies and two crimes of dishonesty. White's attorney and the State then stipulated that Jordan

had two prior felony convictions, plus two misdemeanors for crimes involving dishonesty.

▆ White's counsel and the State then approached the bench, and in a conversation with opposing counsel and the court, White's counsel advised the court that he intended to question Jordan regarding felony charges which were then pending against Jordan. The trial judge refused to allow such questioning unless counsel could provide some authority for doing so, because the judge believed that questioning was not within Neb. Evid. R. 609, which states in part:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination, but only if the crime (a) was punishable by death or imprisonment in excess of one year under the law under which he was convicted or (b) involved dishonesty or false statement regardless of the punishment.

Neb. Rev. Stat. § 27-609 (Reissue 1995). White's counsel admitted that the pending charges were not convictions as required by rule 609, but stated that such charges gave Jordan a reason to want to ingratiate herself with the State by testifying in a way that she thought would help convict White. However, the prosecutor informed the court that Jordan was testifying under subpoena and that no plea agreement had been made, or offered, concerning her pending charges. White's counsel then attempted to make an offer of proof by reciting that if asked, Jordan would say she had pending felony charges in Lancaster County, and that she probably thought testifying against White would benefit her in her pending cases, which White's counsel said would be a motive to testify falsely in the instant case. The offer of proof was made during a bench discussion between counsel and the court. The trial court rejected the offer of proof and refused to allow questioning regarding Jordan's pending charges.

▆ While rule 609 clearly allows a witness' credibility to be attacked with previous convictions, the rule does not include pending charges. Furthermore, the Nebraska Supreme Court has refused to allow testimony relating to the credibility of the witness when "'sufficient evidence was admitted which reflected upon the truth and veracity of the complaining witness.'" *State v.*

*Lewis*, 241 Neb. 334, 345, 488 N.W.2d 518, 526 (1992) (quoting *State v. Vicars*, 207 Neb. 325, 299 N.W.2d 421 (1980)). In *Lewis*, the defendant attempted to offer evidence of a witness' pending forgery charge in order to show that the witness was biased in favor of the State because the witness was seeking leniency on such charge, the same notion that White's attorney had in mind in the instant case. However, in *Lewis*, evidence had already been adduced that the witness had four prior felony convictions, including one for a crime of dishonesty. Further evidence showed that the witness had previously entered into a plea bargain with the county attorney to reduce one felony count, with habitual criminal sentencing enhancement, to a misdemeanor. The Supreme Court found that such evidence sufficiently reflected on the witness' veracity and that refusing to admit further evidence regarding a pending forgery charge upon which the witness might seek leniency was not an abuse of discretion.

In the instant case, abundant evidence of criminal history was admitted upon which the jury, if so inclined, could find Jordan's veracity wanting. During a bench discussion, the State told White's counsel and the court that no plea deal had been offered to Jordan and that she was testifying under subpoena. Such assertions were not challenged by questioning Jordan outside the presence of the jury to establish that there was a plea agreement or even that she personally held some expectation that her testimony would produce a favorable disposition of her pending charges. We see little, if anything, to distinguish this case from *Lewis* such that we could say that the trial court abused its discretion in rejecting the cross-examination of Jordan.

We note that White refers us to *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), for the proposition that it is error for the trial court to deny cross-examination for bias in a criminal case. However, as White himself points out, *Quintana* involved a witness' release after arrest for terroristic threats, without being charged, shortly before the defendant's trial. In *Quintana*, the Supreme Court noted that as a component of the defendant's right to confront the witness, he was entitled to present these circumstances to the jury so that it could decide whether the witness' testimony was biased by a personal desire to curry favor with law enforcement authorities regarding the offense for which he

was arrested but not yet charged. However, for our purposes, it is most important that the *Quintana* court found that the harmless error doctrine applies to a confrontation clause violation, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). In *Quintana*, the Nebraska Supreme Court quoted from *Delaware v. Van Arsdall, supra*, as follows:

"The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."

261 Neb. at 49, 621 N.W.2d at 132.

In any event, even if we assume that the restriction on cross-examination of Jordan was erroneous, it was harmless error, and to so conclude, we only need to consider the "overall strength of the prosecution's case." There was overwhelming evidence of White's guilt of the burglary. White was observed at the scene, followed from the scene to his first traffic stop, and then stopped again within seconds, at which point the burglary victim's distinctive bank bag was found in White's vehicle. Such evidence leaves little if any doubt that White was involved in the burglary. Thus, even if we assume there was a confrontation clause violation in the restriction on cross-examination of Jordan, such was quite obviously harmless error. This assignment of error is without merit.

*Ineffective Assistance of Counsel.*

White argues that trial counsel provided ineffective assistance of counsel. The Nebraska Supreme Court has held:

[I]n order to raise the issue of ineffective assistance of trial counsel where appellate counsel is different from trial counsel, a defendant must raise on direct appeal any issue of

ineffective assistance of trial counsel which is known to the defendant or is apparent from the record, or the issue will be procedurally barred on postconviction review.

*State v. Williams,* 259 Neb. 234, 239, 609 N.W.2d 313, 318 (2000).

The Nebraska Supreme Court has adopted a two-prong test for proving a claim of ineffective assistance of counsel, as set forth by the U.S. Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See *State v. Nielsen,* 243 Neb. 202, 498 N.W.2d 527 (1993), *disapproved on other grounds, State v. Canbaz,* 270 Neb. 559, 705 N.W.2d 221 (2005). To establish that he or she was denied effective assistance of counsel, the defendant must show that counsel was deficient, meaning that counsel did not perform at least as well as a criminal lawyer with ordinary training and skill in the area. See *Strickland v. Washington, supra.* Second, the defendant must make a showing that he or she was prejudiced by the actions or inactions of his or her counsel by demonstrating with reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *id.* The two-prong test for an ineffective assistance of counsel claim need not be addressed in order. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *State v. Williams, supra.*

"Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question." *State v. Molina,* 271 Neb. 488, 532, 713 N.W.2d 412, 449 (2006). "When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal." *Id.*

Specifically, White argues that second trial counsel provided ineffective assistance of counsel when counsel failed to provide details of Jordan's pending felony charges and to provide the available legal authority requested by the trial judge to support White's contention that he should be allowed to cross-examine Jordan about those charges. As discussed above, there was overwhelming evidence of White's guilt which is demonstrated by

two facts—there was a break-in at Wolfe's apartment and her distinctive bank bag was found in White's vehicle. Because any restriction upon the cross-examination of Jordan regarding her pending criminal charges was harmless error, it follows that White could not have been prejudiced by any steps his trial counsel did not take which might have succeeded in convincing the trial court to allow the proposed cross-examination. See *State v. Williams, supra*. This assignment is without merit.

### CONCLUSION
For the reasons stated above, we affirm White's conviction and sentence.

AFFIRMED.