IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SMITH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KIDONNIE R. SMITH, APPELLANT.

Filed March 17, 2026.    No. A-25-118.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

Oluseyi O. Olowolafe, of Olowolafe Law Firm, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

RIEDMANN, Chief Judge, and PIRTLE and FREEMAN, Judges.

FREEMAN, Judge.

## I. INTRODUCTION

Following a jury trial, Kidonnie R. Smith appeals his conviction for possession of a firearm by a prohibited person entered by the district court for Lancaster County. He argues that the district court erred in denying his motion to suppress. He also argues that there was insufficient evidence to support his conviction and that the State engaged in prosecutorial misconduct. For the reasons explained below, we affirm.

## II. BACKGROUND

Tiffanie Collier was at a trailer home in Lincoln, Nebraska, when Smith came to visit the son they had in common. Present at the home was Collier's mother, Michelle Smith (Michelle), and Michelle's significant other, Seymour Wilson. That night, Michelle reported a disturbance at

the home. Police Officer Nicholas Vest responded to the call and arrived after Smith had left the home. Vest took the name and number of each witness present.

After speaking with the witnesses, Vest determined that a physical altercation had occurred between Smith and Wilson. Collier reported to Vest that her firearm was stolen sometime during the altercation.

Later that night, Vest found Smith in his vehicle, which was parked near the home in the driveway of another trailer home that was for sale. Vest conducted a warrantless search of Smith's vehicle and found the firearm inside.

Smith was ultimately charged with possession of a firearm by a prohibited person.

1. MOTION TO SUPPRESS

Smith moved to suppress the evidence found in the vehicle, claiming that Smith had an expectation of privacy and therefore the search of the vehicle was unconstitutional. The following testimony was adduced at the hearing on Smith's motion to suppress.

(a) Vest's Testimony

Vest received the report of the disturbance at the home around 9 p.m. Vest testified that upon arriving on the scene, Collier told him that Smith was a convicted felon and had taken one of her firearms from her purse inside the home. Collier was able to describe the firearm and where she purchased it. Later, Vest ran a criminal history check on Smith and confirmed that he was a convicted felon. Collier and Michelle indicated that Smith had left the home in his vehicle, a Kia Stinger.

Around 2:30 a.m. that same night, Vest witnessed the vehicle matching the description of Smith's driving on the public roadways. Based on his investigation, Vest did not believe that Smith had come back to the home prior to 2:30 a.m. He also learned that Smith "did not have anywhere else to go." Therefore, Vest believed that the firearm was still in Smith's vehicle.

After Smith parked in the driveway of the home that was for sale, Vest approached his vehicle. Smith exited the vehicle and had a brief conversation with Vest before running from the scene. The police were able to apprehend Smith in front of Collier's, Michelle's, and Wilson's home. Smith was unable to access the vehicle after he was detained.

Prior to the search, Vest shined his light into the vehicle but was unable to see inside because the windows were tinted. Vest believed that the vehicle belonged to Smith. Though Smith did not give consent to search the vehicle, Vest testified that his sergeant gave him permission to conduct a search.

Collier attempted to move the vehicle prior to Vest's search. According to Vest, Collier was moving the vehicle per Smith's request because Smith was afraid that his vehicle might be towed.

Based on his conversations with the parties, Vest believed that Smith did not live at the trailer home where Collier, Michelle, and Wilson were residing. Vest was aware that Smith claimed he had permission to park in the driveway where he was found.

Later, Vest contacted the son of the owner of the home whose driveway Smith had parked in. According to Vest, the son stated that neither he nor his mother, the owner, had given anyone permission to park in the driveway. While Collier claimed that they had permission to park in the

driveway by the leasing office, Vest did not speak with the leasing office regarding whether Smith had permission to park in the driveway.

### (b) Collier's Testimony

Collier testified that she was Smith's fiancé. She claimed that she, Smith, and their son were living temporarily with Michelle and Wilson at the trailer home after having moved from out-of-state. According to Collier, Michelle told Collier and Smith that they could park in the driveway where Smith was found. Collier testified that Michelle had received permission from the "property manager or the leasing agent" to park in the driveway. Collier was never told that she could not park in the driveway. From her observations, she believed that Smith also thought he had permission to park in the driveway. At the hearing, she claimed that she was unsure of where her firearm was, so it was possible that Smith had her firearm.

### (c) District Court's Ruling

The district court found Vest's testimony to be "entirely credible" and that any evidence used by Smith to support his motion to suppress was flawed and not credible. The district court found that there was probable cause to search Smith's vehicle for the firearm and that "the automobile exception obviated the need for a warrant." Therefore, Smith's motion to suppress was denied.

### 2. TRIAL

The case proceeded to a jury trial where Smith stipulated that he was a convicted felon. At trial, the following testimony was adduced.

### (a) Officers' Testimony

Vest claimed that Michelle and Collier both stated that Smith had a firearm. However, neither Collier nor Wilson told him that they had seen Smith take a firearm, nor was there a firearm used in the disturbance. No firearm was found on Smith's person.

While searching Smith's vehicle, the police had difficulty opening the glovebox because it was locked. The police obtained the keys to the vehicle from Smith.

A second police officer, Officer Michael Belleci, testified that he found the key to the glovebox inside the key fob to the vehicle. After opening the glovebox, Belleci found the firearm inside the glovebox loaded with the magazine.

### (b) DNA Analysist's Testimony

A DNA analyst, Danielle Oshlo, examined the DNA obtained from the firearm and the magazine to the firearm that was located in Smith's vehicle. Oshlo determined that the DNA from the firearm was uninterpretable. However, Oshlo determined that Smith was a contributor to the DNA obtained from the magazine.

### (c) Collier's Testimony

Collier testified that she had been romantically involved on and off with Smith for the past 9 years. Since the day of the disturbance, she had another child with Smith.

Collier purchased a firearm around 2021. She claimed she never told Smith she owned a firearm and that he had never seen the firearm.

Her normal routine would be to remove her firearm from a safe, put the firearm in her purse, and take it with her to the car. She would then place the firearm in the locked glovebox while she was at work. When she returned home, she would place the firearm back in the safe.

Collier testified that she had been driving Smith's vehicle on the day of the disturbance because her vehicle was in the shop. That day, she followed the same routine of placing her firearm in the locked glovebox of Smith's vehicle while she went to work. However, on that day, she claimed she forgot the firearm in the glovebox of Smith's vehicle.

Collier initially believed that Smith had taken her firearm from her purse because her purse had been flipped over during the disturbance. As such, Collier reported to Vest that Smith had taken her firearm. She did not realize that she had forgotten the firearm in the glovebox until the police began to search the vehicle. Collier did not inform the police that she had forgotten the firearm in the vehicle as it was late at night when the police found the firearm and she was in a daze. She was also upset at Smith for getting into a fight with her mother.

Collier believed she would be able to tell the police later about how she forgot the firearm in the glovebox because Vest said he would call for her statement later that day. When Vest did not call, she informed the police the following day how she had forgotten the firearm.

### (d) Michelle's Testimony

Michelle testified that she did not see Smith with a firearm during the disturbance, nor did he threaten anyone with a firearm. She told police that Smith had a firearm because Collier could not find hers. She claimed to have lied about whether Smith had a firearm because she was angry at Smith. However, Michelle clarified that she did not know whether Smith had the firearm or not.

### (e) Smith's Testimony

Smith testified that he was unaware that Collier had a firearm and that he never touched the firearm or the firearm's magazine. Collier had been driving Smith's vehicle to work because her vehicle was in the shop. Collier would also use his vehicle to drive Smith to work. Smith claimed that he did not know there was a firearm in the glovebox of his vehicle, nor was there a reason for him to open his glovebox because he normally did not open it. After being arrested and on his way to the station, Smith explained that he told police that the firearm was Collier's because she was the only person who could have left a firearm in his vehicle.

### 3. CLOSING ARGUMENTS

At the beginning of the trial, before closing arguments, and after closing arguments, the district court instructed the jury that arguments made by the attorneys were not evidence. The jury was instructed that if an attorney's "recollection of evidence differs from your recollection, you must follow your own recollection." The jury was to "rely solely upon the evidence in this trial and that general knowledge everyone has" in determining the facts and applying the law to those facts.

At closing, the State argued that Smith's familial relationship with Collier and Michelle biased their testimony. The State's attorney discussed how Collier's, Michelle's, and Smith's

testimony was not reasonable. Specifically, Collier's claim that Smith never knew that she owned a firearm was unreasonable because of their long relationship, which included coparenting children. It was also unreasonable that Collier did not report to the police how she had forgotten the firearm in the vehicle on the same night that the police found the firearm and arrested Smith.

Specifically, the State argued,

> One thing that is not reasonable, I believe, is that the explanation of Ms. Collier, she's there when the search is taking place, the search is taking place when he is in a cruiser. And officers are telling everybody, Mr. Smith, Ms. Collier, Ms. Smith, Yeah, well, we're going to arrest him for possession of a firearm because he's a convicted felon.

The State questioned whether it was reasonable for Smith to flee from the police based on Smith's previous encounters with police. And the State claimed, "So we know [Smith's] DNA is on the magazine. And that is consistent with somebody handling that handgun or that --- at least the magazine."

### 4. JURY VERDICT

Ultimately, the jury found Smith guilty of possession of a firearm by a prohibited person. Smith appeals.

## III. ASSIGNMENTS OF ERROR

Smith argues, restated and restructured, that (1) the district court erred in denying his motion to suppress, (2) there was insufficient evidence to support his conviction, and (3) the State engaged in prosecutorial misconduct.

## IV. STANDARD OF REVIEW

When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

When a defendant has not preserved a claim of prosecutorial misconduct for direct appeal, we will review the record only for plain error. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). We apply the plain error exception to the contemporaneous-objection rule sparingly. *Id.*

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Smith argues that the district court erred in denying his motion to suppress because his vehicle was searched without a warrant and that the automobile exception did not apply.

Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). The ultimate touchstone is one of reasonableness. *Id.* Searches and seizures must not be unreasonable, and searches without a valid warrant are per se unreasonable, subject only to a few specifically established and well-delineated exceptions. *Id.* Among the established exceptions to the warrant requirement is the "automobile exception." *Id.* The "automobile exception" to the warrant requirement applies when a vehicle is readily mobile and there is probable cause to believe that contraband or evidence of a crime will be found in the vehicle. *Id.*

### (a) Readily Mobile

Smith argues that his vehicle was not readily mobile. A vehicle is readily mobile whenever it is not located on private property and is capable or apparently capable of being driven on the roads or highways. *Id.* Here, Smith does not contest that his vehicle was capable of being driven on the roads or highways. Therefore, we focus our attention on whether Smith's vehicle was located on private property.

In *State v. Seckinger, supra*, the Nebraska Supreme Court relied on *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017) in determining that "not located on private property" was an element to find a vehicle readily mobile. *Rocha* analyzed the U.S. Supreme Court's decisions in *Cardwell v. Lewis*, 417 U.S. 583, 94 S. Ct. 2464, 41 L. Ed. 2d 325 (1974), and *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971).

In *Cardwell*, the U.S. Supreme Court distinguished a search of a vehicle on private property from a search of a vehicle in a public place where access was not meaningfully restricted. The U.S. Supreme Court discussed that the automobile exception did not apply in *Coolidge* because the search required entry upon the defendant's private property. See *Cardwell v. Lewis, supra*. See, also, *Collins v. Virginia*, 584 U.S. 586, 138 S. Ct. 1663, 201 L. Ed. 2d 9 (2018) (automobile exception does not afford necessary lawful right of access to search vehicle parked within home or its curtilage because it does not justify intrusion on person's separate and substantial Fourth Amendment interest in his home and curtilage). The automobile exception applied in *Cardwell* because the vehicle was found in a public parking lot.

In this case, even though Smith was parked on private property, he did not own the property. However, Smith argues that he still had an expectation of privacy in the driveway even if he did not own the property because, when reviewing Fourth Amendment rights, the question is not merely whether the defendant had an interest in the property, but whether there was an expectation of privacy. See *United States v. Salvucci*, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980).

For his argument, Smith relies on *Rakas v. Illinois*, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). In *Rakas*, the U.S. Supreme Court reviewed its decision in *Jones v. United States*,

362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), *overruled, United States v. Salvucci, supra*. The Court discussed that the petitioner in *Jones* could legitimately expect privacy in an apartment that he did not own because he had permission to stay in the apartment by the owner. See *Rakas v. Illinois, supra*. However, the Court held that while permission to be on a premises is relevant to one's expectation of privacy, it cannot be deemed controlling. See *id.* Other factors that were relevant to whether the petitioner had an expectation of privacy included the type of property, an apartment, and that he could exclude others, except the owner, from it. See *id.*

Here, Smith did not have an expectation of privacy in the neighboring driveway. First, there was contested testimony that Smith lived at the nearby trailer home with Collier, calling into question whether Smith expected any privacy in a place he was only visiting. Next, we agree with the district court in questioning the credibility of whether Smith had permission to park in the neighboring driveway from a leasing agent as the owner of the driveway did not give anyone permission to park there.

Even if Smith had permission to park in the neighboring driveway, it is not controlling on whether he had an expectation of privacy. Unlike in *Jones*, Smith's property involved a vehicle and not an apartment. The reasonable expectation of privacy in a vehicle is less than in one's home. See *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017). Smith was also unable to exclude others from the driveway. It appears that Smith even questioned whether he had an expectation of privacy as he feared that his car would be towed if left in the driveway.

Therefore, Smith's vehicle was readily mobile because he did not have an expectation of privacy in the driveway.

### (b) Probable Cause

Smith argues that the second element to the automobile exception does not apply because there was no probable cause to search his vehicle. Probable cause to search requires that the known facts and circumstances are sufficient to warrant a person of reasonable prudence in the belief that contraband or evidence of a crime will be found. *State v. Seckinger*, 301 Neb. 963, 920 N.W.2d 842 (2018). Probable cause is a flexible, commonsense standard that depends on the totality of the circumstances. *Id.* It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. *Id.*

In *State v. Podrazo*, 21 Neb. App. 489, 840 N.W.2d 898 (2013), we concluded there was probable cause to search a vehicle for evidence of a crime when the vehicle matched the description the officer received of the defendant's vehicle and that the officer was aware that a crime occurred in the defendant's vehicle the day prior. Here, Vest was given the description of the vehicle Smith left in. Vest was told that Smith had a firearm by Collier and Michelle, and he later confirmed that Smith was a convicted felon. Vest found the vehicle matching the description of Smith's about 5 hours after the incident was reported.

Smith argues that it was not reasonable for Vest to still believe the firearm was in the vehicle after 5 hours had passed.

> The ultimate criterion in determining the degree of evaporation of probable cause . . . is not case law but reason. The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the

character of the crime . . . of the criminal . . . of the thing to be seized . . . of the place to be searched . . . etc.

*State v. Lantz*, 21 Neb. App. 679, 695, 842 N.W.2d 216, 231 (2014) (quoting *State v. Groves*, 239 Neb. 660, 680, 477 N.W.2d 789, 802-03 (1991) (Shanahan, J., concurring; Caporale, J. joins)). Though the passage of time's effect on probable cause is fact specific and relies on reason, previous case law has found probable cause after even longer periods than 5 hours. See, *State v. Groves, supra* (finding probable cause to search residence for firearm and drugs after approximately 12 days); *State v. Lantz, supra* (finding probable cause to search residence for DNA after 14 months); *State v. Podrazo, supra* (finding probable cause to search vehicle for evidence of crime after 1 day).

Here, Vest was told that Smith had a firearm as a convicted felon, Vest had reason to believe that Smith left in his vehicle with the firearm, and Smith had nowhere else to go. Considering the totality of the circumstances, it was reasonable for Vest to believe that there was a substantial chance that the firearm was still located in Smith's vehicle after 5 hours.

Additionally, it was reasonable for Vest to rely on Collier's and Michelle's statements. Collier provided a reliable report describing the details of Smith's vehicle, details of her firearm, and where her firearm was located before it went missing. See *State v. White*, 15 Neb. App. 486, 732 N.W.2d 677 (2007) (finding informant's report to be reliable when informant identified vehicle, location, and people involved in suspicious activity, even though no crime was observed by informant). Vest also was able to corroborate Collier's and Michelle's report when he discovered Smith driving the vehicle that Collier and Michelle described. See *State v. Hidalgo*, 296 Neb. 912, 896 N.W.2d 148 (2017) (finding informant reliable after police verified location described). Collier and Michelle also identified themselves by name and, in doing so, positioned themselves to be held accountable for their report. See *State v. White, supra* (citing *State v. Ege*, 227 Neb. 824, 420 N.W.2d 305 (1988)).

Therefore, based on the totality of the circumstances, there was probable cause to search Smith's vehicle because it was reasonable to believe the firearm would be found.

Because Smith's vehicle was readily mobile and there was probable cause to search his vehicle, the automobile exception applied. Therefore, the district court did not err in denying Smith's motion to suppress because of the automobile exception to the warrant requirement.

### 2. SUFFICIENCY OF EVIDENCE

Smith argues that the evidence presented at trial was insufficient to find him guilty of possession of a firearm by a prohibited person.

Pursuant to Neb. Rev. Stat. § 28-1206 (Cum. Supp. 2022), "(1) A person commits the offense of possession of a deadly weapon by a prohibited person if he or she: (a) Possesses a firearm, a knife, or brass or iron knuckles and he or she: (i) Has previously been convicted of a felony." At trial, the parties stipulated that Smith had previously been convicted of a felony. Therefore, we focus our attention on whether there was sufficient evidence that he possessed a firearm.

Possession includes both actual and constructive possession. See *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021). No one witnessed Smith in actual possession of the firearm;

therefore, we consider whether Smith was in constructive possession of the firearm. The concept of constructive possession has been applied to the crime of a felon possessing a firearm under § 28-1206. See *State v. Warlick, supra.* Constructive possession means the possessor did not have actual possession but was aware of the presence of the contraband. *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019). Constructive possession may be proved by direct or circumstantial evidence and may be shown by the accused's proximity to the item at the time of the arrest or by a showing of dominion over it. *State v. Warlick, supra*.

Smith argues constructive possession cannot be proved as he did not have knowledge of the firearm. Even if we were to assume from the testimony that Collier left the firearm in the vehicle, it would be rational for a jury to find that Smith had knowledge of the firearm.

Collier and Michelle both stated that Smith had a firearm. Smith had been in a relationship with Collier on and off for 9 years, including during 2021 when Collier purchased the firearm. Collier was using Smith's vehicle to drive herself and Smith to work. Collier testified that she would normally place the firearm in the vehicle glovebox while she was at work. On the day of the disturbance, Collier drove Smith to work and used Smith's vehicle to store the firearm. And Smith later told police that the firearm was Collier's, though he claimed it was an assumption and not based on his personal knowledge.

Also, Smith was found holding the key to the glovebox that contained the firearm. The holder of a key, be it to a dwelling, vehicle, or motel room in question, has constructive possession of the contents therein. *State v. Sherrod, supra*.

In addition to this evidence, pursuant to Neb. Rev. Stat. § 28-1212 (Reissue 2016):

The presence in a motor vehicle other than a public vehicle of any firearm or instrument referred to in section 28-1203, 28-1206, 28-1207, or 28-1212.03 shall be prima facie evidence that it is in the possession of and is carried by all persons occupying such motor vehicle at the time such firearm or instrument is found, except that this section shall not be applicable if such firearm or instrument is found upon the person of one of the occupants therein.

A firearm was found in the glovebox of the vehicle that Smith was driving; therefore, there is prima facie evidence that Smith possessed the firearm. See *State v. Warlick, supra* (finding no merit to insufficient evidence claim when there was constructive possession and prima facie evidence under § 28-1212 to prove possession of deadly weapon by prohibited person).

Smith also points out that his DNA was found on the magazine, not the firearm, and that fleeing from the police is not sufficient to prove guilt. However, these arguments go to the weight and credibility of the evidence. We do not resolve conflicts in the evidence or reweigh the evidence; such matters are for the finder of fact. See *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

Viewing the evidence in the light most favorable to the State, a rational trier of fact could find beyond a reasonable doubt that Smith possessed a firearm. Therefore, there was sufficient evidence to find him guilty of possession of a firearm by a prohibited person.

Smith argues that he was prejudiced when the State engaged in prosecutorial misconduct by expressing personal opinions and misleading statements in the closing arguments.

Smith concedes that at the time of trial he failed to move for mistrial based on prosecutorial misconduct. The failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021). An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. See *id.* Therefore, we will conduct a plain error review. See *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024).

When considering a claim of prosecutorial misconduct, an appellate court first considers whether the prosecutor's acts constitute misconduct. *Id.* As we have stated, prosecutorial misconduct cannot be neatly defined, but generally encompasses conduct that violates legal or ethical standards for various contexts because the conduct will or may undermine a defendant's right to a fair trial. *Id.* A prosecutor's conduct that does not mislead and unduly influence the jury is not misconduct. *Id.*

Smith argues that the State engaged in prosecutorial misconduct because it expressed personal opinions when it referred to the testimony of Smith's witnesses as unreasonable.

Prosecutors generally may not give their personal opinions on the veracity of a witness or the guilt or innocence of the accused. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). However, when a prosecutor's comments rest on reasonably drawn inferences from the evidence, the prosecutor is permitted to present a spirited summation that a defense theory is illogical or unsupported by the evidence and to highlight the relative believability of witnesses for the State and the defense. See *State v. Barnes, supra*.

We look at the entire context of the language used to determine whether the prosecutor was expressing a personal opinion or merely submitting to the jury a conclusion that the prosecutor is arguing can be drawn from the evidence. See *id.* Statements are not prosecutorial misconduct when the statements are made in the context of a detailed summation of the evidence or are properly viewed as a commentary on the evidence presented at trial, as opposed to an expression of personal opinion. See *id.* (referencing *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016)).

Here, the State did not engage in prosecutorial misconduct because it presented several conclusions that could be reasonably drawn from the summary of the evidence. First, the State concluded from the testimony that it was unreasonable for Smith not to know that Collier had a firearm because Smith and Collier were in a long romantic relationship. The State claimed that the unreasonableness of the testimony affected Collier's credibility. Second, the State questioned whether it was reasonable for Smith to flee from police based on testimony regarding Smith's previous police encounters. Lastly, the State concluded that Smith's family relationship with the witnesses could hinder their believability due to bias.

Smith also points out two specific statements that require additional analysis. The State claimed:

> One thing that is not reasonable, I believe, is that the explanation of Ms. Collier, she's there when the search is taking place, the search is taking place when he is in a cruiser.

And officers are telling everybody, Mr. Smith, Ms. Collier, Ms. Smith, Yeah, well, we're going to arrest him for possession of a firearm because he's a convicted felon.

The State argued that it was unreasonable for Collier to not report her mistake of forgetting the firearm in the glovebox at the time that the police found the firearm. According to the State, if Collier had forgotten her firearm in the glovebox, she should have mentioned it at the time of the search and Smith's arrest. Though we emphasize that prosecutors could easily avoid an appearance of impropriety by simply substituting "I believe" with the simple phrase "the evidence shows," this statement is not misconduct because it is a conclusion that could be reasonably drawn from the evidence. See *State v. Hernandez, supra*.

The State also asserted, "So we know his DNA is on the magazine. And that is consistent with somebody handling that handgun or that -- at least the magazine." This statement could be a reasonable conclusion drawn from the evidence as the magazine was found loaded in the firearm. Even if it were to be considered misleading, it is not prejudicial to Smith.

And even if we concluded the prosecutor's statements regarding the DNA and the handling of the firearm were misconduct, which we do not, we would next consider whether the misconduct prejudiced Smith's right to a fair trial. See *State v. Barnes*, 317 Neb. 517, 10 N.W.3d 716 (2024). In determining whether a prosecutor's improper conduct prejudiced the defendant's right to a fair trial, we consider the following factors: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction. *Id.*

Here, the State's questioned remarks were limited, and the prosecutor immediately corrected any misleading remarks by clarifying that the DNA was consistent with someone at least handling the magazine and not necessarily the firearm. Further, as discussed above, there was sufficient circumstantial evidence to find Smith guilty of possession of a firearm by a prohibited person apart from the DNA evidence.

Additionally, the district court instructed the jury that arguments made by the attorneys were not evidence. The jury was to follow their own recollection of evidence if it differed from the attorneys'. The jury was instructed to "rely solely upon the evidence in this trial and that general knowledge everyone has" in determining the facts and applying the law to those facts. A jury is presumed to follow its instructions. *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025).

Therefore, we do not find prosecutorial misconduct based on our plain error review.

## VI. CONCLUSION

We conclude that the district court did not err in denying Smith's motion to suppress, there was sufficient evidence to support the conviction, and there was no prosecutorial misconduct.

AFFIRMED.